Curia, per Johnson, Ch.
One of the questions arising out of this appeal, and that which I propose first to notice, is whether the defendant is bound to account for the hire of the slaves bequeathed by the testator to his grand-daughter Esther, the complainant.
On the first trial on the circuit, before myself, this question was not seriously pressed on the part of the complainants; but on a re-examination of it upon the argument here, I am still satisfied with the conclusion at which I arrived on the hasty consideration which I then gave it.
*367 In the first clause of the will, the testator gives to Esther, 11 negroes, by name, absolutely and unconditionally, and in a subsequent clause, he makes a similar provision for his grand-daughter Mary, both then infant children of his son, the defendant. The following is found in the 8th clause of the will, to wit: “And I do hereby appoint my son Thomas,” (the defendant,) “ guardian of the said Esther and Mary, and direct that he shall have the use of the property herein devised to them, until they come of age or marry, for their maintenance and education.”
The language of these provisions of the will, when taken together, are too plain to admit of any doubt about their interpretation. Clearly, the testator intended that the defendant should have the use and possession of the negroes, until his daughters arrived at the age of 21, or married. That he was to maintain and educate them, and upon the happening of one or the other of these contingencies, the negroes were to be delivered over to them.
The question then is, what did the testator intend by giving to the defendant the use of the negroes until the legatees came of age or married 1 Was it that he should have the use as an equivalent for their maintenance and education, or did he intend that the defendant should be held to a strict account for hire 1
There is no question, that generally, the usufruct, will follow the corpus of the legacy. But it is equally true that the testator had the right to confer on one, a vested interest in the property bequeathed, and on another, the use for a limited period, or until the happening of some contingency; and when he directs that Thomas “ shall have the use of the property,” his will is as clearly expressed, and of equal validity with the direct bequest of the corpus to Esther. Thomas is to have the use, and must provide for the education and maintenance of his daughters. This is the plain common sense interpretation of the language of the will.
In the absence of any positive rule, we are at liberty to look through all the attending circumstances — the relations between the parties — all the provisions of the will, and the nature and condition of the estáte, to enable us to arrive at the intention of the testator; and if we recur to the history of this case, it will be found *368 that there are abundant reasons why the testator ought not to have charged the defendant with an account for the use beyond the objects expressed in the will; and in a question of doubtful construction, these must have their influence. The clause in question, in itself, I think sufficiently indicates an intention that he should not be charged with .hire. The testator appoints the defendant guardian of the legatees, which of itself would entitle him to the possession and charge him with an accountability for the income of the estate, and he must have intended something beyond this, when he gives him the use: and for what else but that the use should be an indemnity for the education and maintenance provided for in the will. I do not mean to say that the testator could confer on the defendant any power over the persons of his daughters; but he clearly had the right to confer on him power over the property which he bequeathed to them.
The case of Brown and Cassamajor, 4 Ves. 498, has been referred to, and bears, I think, strongly on the question. There the testator bequeathed to H. S. £7000, the better to enable him to provide for his younger children, and it was held that although the children were entitled to the principal sum, H. S. was not bound to account for interest. Here the testator gives to the defendant the use of the property, for the education and maintenance of his grand-daughters, and on the same principle, he ought not to be held to a rigid account, if he has performed the obligation imposed on him.
The case of Pope v. Wilmot, Amb. 704, has been referred to as opposed to this conclusion. There the testator devised his estate to trustees, and directed that they should raise, out of certain portions of it, any sum that they should think fit, not exceeding £3000, for the advancement of his son. They purchased a commission in the army for him, which, together with his equipments, cost £1093 7s. 6d., and on a. bill filed for an account of this legacy, it was held that the son was entitled to the residue of the legacy of £3000. The Master of the Rolls being of opinion that this was' a legacy to the son, and it will be remarked, that there was not, as in this case, any direct bequest to the trustees.
The only remaining question is, whether the defendant is charg *369 able with the hire of the negroes, bequeathed to James Rainsford, according to what is called the £10 rule, or at the rate at which they would hire, or at any and what other rate.
Since the case of Lyles v. Lyles, 1 Hill. Ch. 87, this question has been several times before the court, under various forms; but the cases have not been reported, and I have not been able to lay my hands on them. My recollection of them, however, is so distinct, that I can hardly be mistaken in supposing that the £10 rule, as an arbitrary rule of value, and indeed every other has been again and again wholly repudiated, and I do not recollect that it has been so applied in any case since that of Strowman v. Rottenburg, 4 Eq, Rep. 270, but the case of Myers v. Myers. The former appears to have been made upon a calculation of the value of negro hire, and in the absence of all proof as to the real value. In the latter, the rule was adopted on account of the impracticability of obtaining satisfactory evidence through a long series of years, embracing a period during which the price of produce varied from the extremes of the lowest and the highest, and could hardly furnish a rule for any other case.
The obligation imposed on a trustee, is -that he shall manage the trust estate in the same manner that a-discreet man would manage his own concerns; and he is accountable if he neglects to perform this duty. He is not permitted to take any profit to himself, and having discharged- his duty faithfully, he is accountable for no more than is actually made. If he be wanting in the performance, he must account for what he ought to have made,, and it will be seen at once, that no arbitrary rule can ascertain the extent of his liability, and no case can furnish a rule for another.— There is no possible way of ascertaining it, by any other means than those that arise from the particular circumstances of each case.
Cases have arisen, and it may well be supposed that others may arise, where precise evidence of the value of the hire of slaves, could not be ascertained by direct evidence, and in those cases, I still think, that a general average founded on a calculation made on the principles pointed out in the note to Lyles v. Lyles, may be relied on as furnishing a rule; but whenever evidence of particu *370 lar value can be obtained, that mode of ascertaining it cannot be resorted to; for the capacity of slaves for labour, the soil on which they are employed, the pursuit in which they are engaged, and the price of produce or other commodities, necessarily enter into the estimate of probable profits.
Regular accounts of receipts and disbursements, would generally supercede the necessity of any other proof, and all these questions arise out of the neglect or omission on the part of the trustee to keep them, and hence the necessity of resorting to other modes of proof. Of course any fact or circumstance, calculated to show the real value, is admissible. The price at which they would hire publicly, is one means of ascertaining it. But for the reasons I have stated in Lyles v. Lyles, this is not always to be relied on as evidence of the reasonable value — most frequently it exceeds it, and in some instances falls below it, as in a case tried by me sometime ago in Georgetown, where getting lumber for market was the principal employment, full grown, able bodied females were hired publicly at from 10 to f 15, annually, inhere negroes are employed on a plantation, an estimate based on the principles indicated in the note to Lyles v. Lyles, made by experienced planters, with reference to the condition of 'the negroes, and the quality of the land, on which they were employed, is another means of ascertaining the value, and strikes me as the most likely to attain the truth; and'whether this, or any other mode of ascertaining the value is resorted to, the attention bestowed by the trustee to the wants of the negroes, and to the health and comfort of the young negroes, ought to enter largely into the estimate. It is the difference in value between a gang of negroes, who have not increased and are reduced to premature old age by excessive labor, and one which has rapidly increased in healthfulness and numbers; but after all, it is a question about which it is impossible to prescribe any fixed rule — all these elements, and perhaps many others, enter into the estimate of value, and the deduction must be the result of reasoning from them, directed by sound discretion.
The evidence on which the commissioners report is founded, is, I think, exceptionable. The value of negro hire was ascertained by the examination of witnesses, who appear not to have had any *371 knowledge of them, or the lands on which they were worked, and formed their opinions of the value on the description of others. It is scarcely possible, that better evidence could not have been obtained, and it ought to have been required. The defendant could not have lived so entirely secluded, as not to have had some neighbor who knew the property and was competent to form some estimate as to the value of hire.
Bausket, for complainants.
Wardlaw, Wardlaw & Carroll, for defendant.
It is therefore ordered and decreed, that so much of the decree of the circuit court, as is opposed to the principles of this opinion, be reversed — and that it be referred to the commissioner to ascertain and report the value of the hire of the negroes bequeathed to complainant James Rainsford, according to the principles of this decree.
Dunkin, Ch. I concur.